COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| RAYMOND SANCHEZ, | § | No. 08-10-00321-CR |
| Appellant, | § | |
| | § | Appeal from the |
| v. | § | 175th Judicial District Court |
| THE STATE OF TEXAS, | § | of Bexar County, Texas |
| | § | |
| Appellee. | § | (TC# 2008CR5899) |
| | § | |

**O P I N I O N**

Raymond Sanchez was convicted of aggravated assault of a child and indecency with a child by contact. He was sentenced to twenty (20) years' in prison for the assault and ten (10) years' of probation for indecency, to be executed concurrently. On appeal, he contends that the State withheld *Brady* material and that his trial attorneys were ineffective. We affirm.

**BACKGROUND**
*Trial Evidence*

The evidence at the guilt-phase of trial consisted solely of the victim's testimony. On direct examination, Renessa Segura testified that she was born in March 1983 and that she was twenty-seven-years-old at the time of trial. Her mother was married to Sanchez when Segura was a child. The events giving rise to the charges against Sanchez occurred when Segura was in the first or second grade. Sanchez and Segura's mother have a son, also named Raymond, who was born in November 1988. Raymond and Segura's younger sister shared a bedroom, while Segura had her own bedroom. Their mother worked the graveyard shift, so the children were often left alone with Sanchez at night.

On one of those nights, Segura and her siblings were asleep on the living room floor. Segura was awakened when Sanchez stuck his finger inside her vagina. That was the first time

that Sanchez assaulted her.   When asked if this was the only time that something like this happened, she answered, "No.   It was a lot of times."   It happened "maybe more than 10 times."

After the first incident on the living room floor, the remaining incidents occurred mostly on the bed in her bedroom, while her siblings were asleep beside her.   Sanchez would bring the other children into the room, and they would all sleep in the same bed.   During this time, her brother was perhaps one- or two-years' old, was not an infant, and was old enough to sleep in a bed. When asked how many times it happened in her bed, she estimated, "five, six, seven times. Maybe seven times."   In all of these incidents, Sanchez put his finger in her vagina.

Segura also testified about two other specific incidents.   On one occasion, Sanchez took her from her bed and carried her downstairs to the master bedroom.   Segura claimed, "I remember him making me take off my clothes and getting on top of him."   He then penetrated her with his penis.   That was the only time that this occurred.

The other specific incident happened in December 1991, after her mother gave birth to a stillborn child.   Sanchez retrieved Segura and her siblings from her grandmother's house, and Segura believed he was going to drive them to the hospital.   While driving, Sanchez said that her mother "had lost her baby and he seemed kind of upset and crying.   He was mad."   Instead of going to the hospital they "ended up parking somewhere like at a park kind of.   I remember he was already trying to put his hands in my underwear again.   He told me . . . to take off my underwear.   . . .   And while I was doing that, he was unbuckling his pants and his belt.   And at that time, I guess he wanted me to . . . get on him, and a car pulled up."   She and Sanchez were in the front seat, and the other children were asleep in the back.

After this incident, Sanchez touched her inappropriately "maybe two or three times."   The abuse ended because she went to live with her grandmother.

2

Initially, Segura did not tell anyone about the abuse because she thought that no one would believe her. Later, Sanchez advised her not to tell anyone or else CPS would take her away from her mother and she would never see her mother again.

The first person she told about the abuse was her mother-in-law. This happened in 2006 or 2007, when Segura was twenty-three or twenty-four years' old. To explain why she told her mother-in-law at that time, Segura testified: "I had an episode where I was just crying and was frustrated . . . my life . . . was a big wreck because of what happened to me. It was controlling me. And I felt like I needed to say it. I needed to tell somebody. I needed to release it." About two months later, she told her mother, but she did not report the abuse to the police until a confrontation occurred between Sanchez, her mother, and her brother Raymond on Thanksgiving 2007.

Segura is estranged from Raymond. He has two children who were in Segura's mother's custody at the time of trial because Raymond had "problems with CPS" and "was on drugs." On Thanksgiving 2007, Raymond and Sanchez went to Segura's mother's house to pick up the children, but her mother refused to give them up. Afterwards, Sanchez called Segura's mother on the phone, "cussing her out, calling her a bitch and that he was going to kill her and was going to mess her up . . . ." Segura then decided to make a police report regarding his abuse of her when she was a child. She was worried that the same things that happened to her could happen to Raymond's children.

On cross-examination, Segura acknowledged that Sanchez was granted custody of Raymond upon his divorce from her mother. She also admitted that Raymond and Sanchez had obtained a police escort to her mother's house on Thanksgiving 2007 "to make sure everything was okay."

Defense counsel challenged Segura's recollection about the time when the abuse occurred.

3

She believed that she was five- or six-years' old when the living-room-floor incident happened and when the penetration occurred, and that all of the incidents occurred between the ages of five and seven. This would mean that her brother Raymond was "either a year or two maybe." Yet he was sleeping upstairs in a bunk bed. Counsel noted that when she was five, Raymond had not been born. Counsel also pointed out that the stillborn birth occurred in December 1991, and Segura agreed that she would have been eight, "going on nine" then.

Much of the cross-examination focused on the statement that Segura had given to the police after the Thanksgiving 2007 incident. Defense counsel got Segura to admit that several allegations in the statement were incorrect. Although her statement said that she was four or five when Sanchez married her mother, she admitted that she did not know when they married. She acknowledged that her statement was incorrect in saying that Sanchez began touching her while her mother was pregnant. The statement was internally inconsistent in that it first says that Sanchez never asked her to touch him, but later says that he made her touch his penis.

In addition, there were inconsistencies between the statement and Segura's direct examination testimony. In the statement, unlike at trial, Segura said that Raymond was an infant when the abuse occurred and that Raymond was still sleeping in his parents' bedroom during the period when the penetration occurred. Also contrary to her trial testimony, her statement said that the assaults occurred every night. Segura attempted to explain this discrepancy by saying that "[i]t seemed like every night." Segura also admitted that there was a discrepancy between her description of the penetration incident in the statement and at trial.

Segura testified that she told her mother-in-law about the abuse in 2006 and that she told her mother a few months later. But she did not remember exactly when she told her mother. It could have been before or after Thanksgiving. Her statement said that she made the police report

on the same day that she told her mother. When defense counsel pointed out that the police report occurred around Thanksgiving 2007, Segura stated, "I made it [the police report] after Thanksgiving. The day after Thanksgiving, but I don't remember what year it was, if it was that same year I told her or the following year." Counsel asked, "So this statement might be – part might also be incorrect?" Segura responded, "Might. Yes."

Segura could not remember where her mother was employed when she worked the graveyard shift, but she remembered the name of Sanchez's employer.

Finally, counsel asked Segura whether she saw a counselor or therapist when she was a child. She answered that both she and her sister did. Counsel then asked whether anyone recommended that she see someone for depression when she was in the first grade, and Segura answered, "No."[1] Counsel said, "No? Okay." At that point, Segura volunteered, "Well, I went to counseling, me and my sister, in elementary. I had drawn some pictures that were unappropriate [sic] and CPS did get involved. And we had to go through counseling." Counsel then passed the witness.

On re-direct, the prosecutor asked Segura what was inappropriate about the pictures she drew. The trial court overruled defense counsel's relevance objection, and Segura stated that the pictures were of a penis.

In his closing argument, defense counsel concentrated on Segura's credibility, particularly her lack of consistency. He emphasized that the timeline of events was unclear. Referring to Raymond's age at the time of the abuse, counsel posited that it was unlikely that a one- or

---

[1] In direct examination, while trying to define the period of time in which the assaults occurred, Segura had mentioned that she failed the first grade two times. The prosecutor asked about the problems she was having in school. Segura stated that she was not concentrating, her grades dropped, she "was real depressed," and she "had to do counseling when [she] was in school."

5

two-year-old child was sleeping in a bunk bed upstairs.   He suggested that the fact that Segura's mother worked the graveyard shift was important because that is how the prosecution established Sanchez's opportunity to commit the assaults.   He then noted that Segura could not say where her mother worked the graveyard shift, yet she knew the name of Sanchez's employer.   Counsel argued that it was unreasonable to believe that Sanchez would take the other children, potential witnesses, with him to commit the abuse and that it was also unreasonable to believe that he would decide to commit a sex offense at "the worst moment of his life," when his child was stillborn. Counsel asserted that Segura made these allegations against Sanchez to help her mother maintain custody of Raymond's children.

In her closing argument, the prosecutor emphasized Segura's testimony about drawing pictures of penises.   She stated that the drawings were important "because this is something that is consistent with a child being molested."   Continuing further, the prosecutor stated:

> Just think about what would have been going through that little girl's mind at that time when CPS is investigating her.   Do you think she is going to tell what happened?   The exact thing that the Defendant was threatening her with, CPS is going to come and take you away from your mother.   You are never going to see her again.   Do you think that at that point she was going to tell what was happening?   No.   And she didn't tell back then and she didn't tell anyone for a really long time because she was worried that nobody would believe her.   Which is a really common thing.

Later, the prosecutor used the drawings to challenge the defense theory that Segura fabricated the charges against Sanchez to help her mother maintain custody of Raymond's children.   She said, "But think about these dates.   That [the custody fight] does not explain drawing penis pictures when you are in elementary school."

### Motion for New Trial Evidence

After his conviction and sentencing, Sanchez retained a new attorney, who filed a motion

6

for new trial on his behalf. In the motion for new trial, counsel argued that the prosecution violated *Brady v. Maryland* by failing to disclose the CPS investigation that resulted from Segura's inappropriate drawings. Counsel also argued that Sanchez's trial attorneys were ineffective.

Joseph Acevedo, Sanchez's primary trial attorney, testified at the hearing on the motion for new trial. At the time of trial, he had been representing Sanchez for approximately two years, during which time Sanchez always professed his innocence. Sanchez advised him that there was a history of acrimony between himself and Segura's mother, and in particular that "she had engaged in assaultive behavior with him." It appeared that Segura's allegations were part of a "power struggle" that had been going on for about twenty years. Acevedo interviewed Sanchez's son Raymond, who essentially agreed with his father's view of the family relationships, and Sanchez's sister, who told him that Segura's mother did not work the graveyard shift during the time in question.

Through an error by either the trial court's staff or Acevedo's staff, Acevedo did not realize that the trial date had been set until the trial was imminent. About a week before trial, Acevedo filed several pretrial motions. He did this because he received "a postcard that said it was set for motions," but "[s]oon thereafter, [he] was told it was not motions, and it was the trial . . . ." At that time, both his wife and father-in-law were ill, so he thought it would be in Sanchez's best interest to call in another attorney for assistance. He secured the help of Brian Powers, a former prosecutor.

In Acevedo's view, the State's case hinged on Segura's credibility. Acevedo testified that there was nothing in the State's file about a CPS investigation, and that the testimony regarding the investigation came as a surprise. He believed that Segura's inconsistencies should have been enough for the jury to acquit Sanchez, but "when there was testimony about CPS . . . that was

7

[something] that we were not prepared to address, because there was nothing in the file . . . ." Acevedo considered the CPS testimony to be so damaging that it resulted in the conviction. The defense strategy would have been different if he had known about the CPS investigation.

Powers testified that Acevedo called him for assistance the day before trial was set to begin. He reviewed the State's file on the day of trial, and did not find any reference to a CPS investigation. Powers also interviewed Sanchez, his sister Julie, his son Raymond, and two of Raymond's former girlfriends. They advised him that the allegations against Sanchez were made in the context of a long-running family dispute. Sanchez and Segura's mother had fought over the custody of Raymond. In addition, Julie told him that she lived with Sanchez and Segura's mother while Segura's mother was pregnant with the child that was stillborn. According to Julie, Segura's mother did not work during that time. Powers was also aware that Segura's mother had a record of committing assaults. He knew that there had been an allegation that Sanchez sexually abused Raymond's daughter, but he did not recall that CPS had ruled out that allegation.

Like Acevedo, Powers believed the primary issue was Segura's credibility. The defense theory was that Segura had a reason to lie because of the ongoing child custody dispute, which was part of a larger family dispute stretching back for decades. The defense did not call witnesses to testify about the family history for strategic reasons. At the completion of Segura's testimony, Powers believed the State had not proven its case beyond a reasonable doubt. He also had "some impeachment concerns" regarding the potential defense witnesses. Powers recalled that Raymond had a criminal history, but he could not recall whether other family members had a criminal history. Powers was also concerned that the family history might not be deemed relevant, as it related more to Segura's mother than to Segura herself. It was a "setback" for the defense when Segura testified about having drawn pictures of penises.

8

The prosecutor testified that she never had any sort of report from CPS regarding Segura. She did not try to obtain any records from CPS because Segura did not tell her about the CPS investigation until either the day before, or the day of, trial.

Sanchez's attorney offered affidavits by Sanchez, his son Raymond, and his sister Julie, at the new trial hearing. Sanchez averred that he was awarded the marital home and managing conservatorship of Raymond when he and Segura's mother divorced. Segura's mother was angry about the custody decision and about having to pay him child support. She harassed him for years and committed acts of vandalism against him. When the CPS case was opened against Raymond, allegations of sexual abuse were made against Sanchez, but those allegations were ruled out by CPS. Sanchez also described the events that occurred around Thanksgiving 2007. He stated that he called the police for an escort to ensure that there "would be no trouble." When Segura's mother refused to open the door, he told her that he "hoped she would rot in hell." Before his indictment, he had another argument with Segura's mother about Raymond's children. Segura's mother told Sanchez that she was "going to get" him. Sanchez claimed that he gave all this information to Acevedo during their first meeting. After their first meeting, he only spoke with Acevedo at docket calls until just before the trial began.

In his affidavit, Raymond stated that trial counsel did not interview him until the week of trial. Although he was at the courthouse and available to testify, counsel told him that he would not be called because of a pending motion to revoke his probation. He asked counsel to resolve the motion, which involved only technical violations, so he could testify. Raymond stated that he did not believe the charges against his father and he described the testimony he would have given about the charges. The affidavit includes many details about Raymond's interactions with CPS concerning his own children. Although the affidavit notes that Raymond, his girlfriend, and

9

Sanchez tested negative for the use of drugs and that CPS ruled out the allegations that Sanchez had sexually abused his granddaughter, it also mentions that Raymond was arrested for assaulting his girlfriend.

In her affidavit, Julie averred that she spoke with defense counsel for the first time during the week of trial and she was available to testify at the guilt-phase. She claimed that she lived with Sanchez and his wife for three-to-five months in 1991. During that time, Segura stayed at her grandmother's house most of the time. The affidavit does not state that Segura's mother did not have a job during that time.

The remaining evidence at the hearing consisted of documents, such as divorce papers, a court-ordered social study arising from the custody dispute over Raymond, and a home study regarding the custody dispute over Raymond's children. In her summation of the evidence at the hearing, Sanchez's attorney noted, among other things, that after the CPS investigation was raised at trial, trial counsel "did not request access to the CPS report, which I don't even know if it exists. Certainly the State never had it in this file. So, you know, whether it ever existed is certainly debatable." The trial court denied the motion for new trial.

## ISSUES ON APPEAL
### *Brady Material*

In his first issue, Sanchez asserts that the State suppressed *Brady* material and then used the related evidence to corroborate Segura's testimony. As explained in Sanchez's opening brief, the prosecutor suppressed the "significant information" that it did not have a CPS report of an investigation into Segura's inappropriate drawings. Although it is clear that the prosecution did not have a CPS report, it "questioned Segura as if such a report existed." The prosecution then used the CPS investigation in closing argument to bolster Segura's testimony by arguing that the

10

drawings and the ensuing investigation were consistent with Segura's allegations.

In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment . . . ." 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). To demonstrate reversible error under *Brady*, Sanchez must show that suppressed information was favorable to him. *Pena v. State*, 353 S.W.3d 797, 811 (Tex.Crim.App. 2011). "Favorable evidence includes exculpatory evidence as well as impeachment evidence. Exculpatory evidence is that which may justify, excuse, or clear the defendant from alleged guilt, and impeachment evidence is that which disputes, disparages, denies, or contradicts other evidence." *Pena*, 353 S.W.3d at 811-12. Sanchez contends that the prosecution's lack of a CPS report is impeachment evidence because, if the defense had known that there was no CPS report, it could have used that fact to impeach Segura's testimony that there was a CPS investigation. He also asserts that if CPS records showed that Segura had not reported sexual abuse by Sanchez, the records would have supported his innocence.

*Brady* only applies when the defense discovers information that was known to the prosecution but unknown to the defense. *Id.* at 810. *Brady* does not require the State to disclose information to defendants that the State does not have in its possession and that is not known to exist. *Id.* Nor does *Brady* require the prosecution to discover information that it does not possess. *Goff v. Bagley*, 601 F.3d 445, 476 (6th Cir. 2010). It is undisputed that both of Sanchez's attorneys reviewed the prosecution's file and found no CPS report. Thus, it was apparent that the prosecution did not have a CPS report. Whether any CPS report actually exists is still an open question. Furthermore, there is nothing in the record to indicate that defense counsel was unaware that Segura made her first outcry when she was an adult. Thus, it was

11

apparent that Segura did not report the sexual abuse during any CPS investigation into the inappropriate drawings.

Because Sanchez has not shown that the prosecution possessed impeachment evidence that was unknown to the defense, he has not demonstrated reversible error under *Brady*. His first issue is, accordingly, overruled.[2]

### *Ineffective Assistance*

In his second issue, Sanchez asserts that he received ineffective assistance of counsel at trial. He contends that his attorneys were ineffective in seven ways: (1) failing to begin trial preparation until only days before trial; (2) failing to obtain rulings on motions; (3) failing to conduct an independent investigation of defensive matters; (4) failing to call available witnesses and use available documentary evidence; (5) failing to object to the admission of extraneous offense evidence; (6) failing to object or move for a continuance when surprised by Segura's testimony about the inappropriate drawings; and (7) failing to object to the prosecutor's improper closing argument.

To prevail on his claim of ineffective assistance of counsel, Sanchez must show that his attorneys' representation fell below an objective standard of reasonableness and that there is a reasonable probability that the result of the proceeding would have been different if not for their errors. *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d

---

[2] In his reply brief, Sanchez argues that "it was the fact of Segura's eve-of-trial information . . . which should have [been] disclosed to the defense under *Brady*." He contends that the defense could have impeached Segura and could have charged her with a recent fabrication, if it had known that she failed to disclose the CPS investigation until either the day before or the day of trial. This contention is waived because it was not included in Sanchez's opening brief. *See Ontiveros v. State*, 890 S.W.2d 919, 931 (Tex.App.--El Paso 1994, no pet.); *Heras v. State*, 786 S.W.2d 72, 72-3 (Tex.App.--El Paso 1990, no pet.). In any event, Sanchez has not cited, and we have not found, any authority suggesting that *Brady* requires the prosecution to advise the defense of the dates on which it received inculpatory information.

12

674 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex.Crim.App. 2011). In evaluating the attorneys' performance, we must presume that it fell within the wide range of reasonably professional assistance. *Lopez*, 343 S.W.3d at 142. Any deficiency must be affirmatively demonstrated in the trial record; we cannot engage in retrospective speculation. *Id.* If the record does not reveal the attorneys' reasons for the challenged conduct, we must "assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined." *Lopez*, 343 S.W.3d at 143.

In his affidavit, Sanchez indicated that Acevedo interviewed him at the beginning of the representation. Beyond this meeting, however, the record suggests that Acevedo did not begin preparing for trial until just days before it was scheduled to begin. Shortly before trial, Acevedo filed a plethora of motions, but failed to obtain a ruling on most of them. He also retained Powers, and both attorneys reviewed the State's file and interviewed Sanchez and potential witnesses.

"[T]o establish that counsel was ineffective due to failure to investigate, an appellant must state with specificity what such investigation would have revealed, what specific evidence would have been discovered, and how the evidence would have altered the outcome of the trial." *Flowers v. State*, 133 S.W.3d 853, 858-59 (Tex.App.--Beaumont 2004, no pet.). Sanchez has not identified any evidence or strategies that counsel could have pursued if they had begun preparation sooner. Nor has he identified any significant information that counsel would have discovered if they had conducted a more thorough or timely investigation. Instead, Sanchez focuses on counsel's failure to make use of all of the available documents and witnesses.

For example, there is documentary evidence to establish some of the relevant dates, such as the date of birth for the stillborn child. Because the relevant dates were established through testimony at trial, counsel were not ineffective in failing to offer the documentary evidence.

13

Most of the unoffered evidence relates to the hostility that Segura's mother has for Sanchez. There is documentary evidence showing that Sanchez was awarded the marital home and custody of Raymond and that Segura's mother failed to pay child support. The information about Raymond's custody and the marital home was established through testimony at trial. Sanchez does not explain how the fact that Segura's mother failed to pay child support for Raymond is relevant to Segura's allegation that Sanchez sexually abused her.

Sanchez asserts that his sister Julie could have testified about Segura's mother's anger toward him. He also points to a home study regarding Raymond's children. The study recommended that the children not be placed with Segura's mother because of her significant criminal history and the fact that her adult children had violent tendencies. All of the evidence concerning Segura's mother was, at best, only minimally relevant. Segura's mother did not testify at trial, so Sanchez had no basis for impeaching her. To the extent that the evidence showed family acrimony, it was cumulative of other evidence admitted at trial. None of the negative information about Segura's mother directly refuted any element of the charges against Sanchez. *See Smith v. State*, 340 S.W.3d 41, 54 (Tex.App.--Houston [1st Dist.] 2011, no pet.)(holding that evidence that child victim's mother was "hateful" toward defendant, her former husband, was only minimally probative because it was cumulative and did not directly refute the elements of the charges, which were established by the victim's testimony).

In addition to its minimal relevance, there may have been several other problems with admissibility of the home study. Assuming that it would have been admissible, it could have opened the door to negative information about Sanchez. For example, the study notes that Segura's mother had "not had an opportunity to cope with the severe physical and emotional abuse she endured during her first three marriages."

14

Turning to the late-filed motions, with one exception, Sanchez does not identify any prejudice from counsel's failure to file, or obtain a ruling on, the motions sooner. The exception concerns extraneous offense evidence. Counsel requested notice of extraneous offense evidence less than a week before trial. The State provided the notice on the day trial began. Included within the notice was evidence that Sanchez threatened to kill Segura's mother on or about November 26, 2007. Sanchez suggests that his attorneys did not have sufficient time to investigate the claim of a threat. However, there is no indication that counsel were unaware of the Thanksgiving 2007 incident or that the threat claim was susceptible to in-depth investigation. In their affidavits, Sanchez and Raymond did not deny that a confrontation concerning Raymond's children occurred that day. Exactly what transpired in the phone conversation between Sanchez and Segura's mother would simply be a "he said/she said" contest.

Sanchez also argues that trial counsel did not make the proper objection at trial to evidence about the threat. Segura testified that when her mother refused to let Sanchez and Raymond take Raymond's children, Sanchez threatened to kill her mother. The prosecutor asked Segura what she did after that threat was made. Segura responded, "Nothing. When he went to pick up the kids, I kind of went into a room by myself. . . . I didn't want to hear anything. I didn't want to know anything." The prosecutor's next question was, "When did you decide to go to the police to make a report about this incident when you were little?" Segura answered, "[W]hen I was in the room when all of this was going on, my husband walked in there. And I just told him that I was tired and I needed to do something, that if I didn't do something it was going to happen to somebody else."

Sanchez argues that his trial counsel should have objected to testimony about the threat, or at the very least requested a limiting instruction, because it revealed an inadmissible extraneous

15

offense.   *See* TEX.R.EVID. 404(b)(providing that extraneous offenses are not admissible to prove character conformity).   Although both of Sanchez's trial attorneys testified at the hearing on the motion for new trial, they were not given the opportunity to explain why they did not make an objection under Rule 404(b).[3]   Accordingly, we cannot find that they were ineffective in this regard unless it is apparent from the record.   The record must demonstrate that the attorneys' performance fell below an objective standard of reasonableness as a matter of law and that no reasonable trial strategy could justify their failure to object.   *See Lopez*, 343 S.W.3d at 143.

To show that counsel was deficient in failing to make a Rule 404(b) objection, Sanchez must show that the trial court would have been required to sustain the objection.   *See Ex parte White*, 160 S.W.3d 46, 53 (Tex.Crim.App. 2004).   However, the evidence was arguably admissible to explain why Segura finally reported the abuse to the police.   *See* TEX.R.EVID. 404(b)(providing that extraneous offenses may be admissible for purposes other than character conformity).   In their closing arguments, both the prosecutor and defense counsel indicated this understanding as to why the evidence was admitted.   Referring to the threat, defense counsel argued, "[S]uddenly that's another reason for why we should be calling the police and reporting something that allegedly happened over a decade before."   The prosecutor noted, "And that day, after he threatened her mother, [Segura] decided she was sick of it.   She told her husband . . . I'm going to go to the police."

Even if the testimony was inadmissible, Sanchez has not shown a reasonable probability that the result of the trial would have been different if it had not been admitted.   There was little mention of the threat during Segura's direct testimony, and the prosecutor did not emphasize the

---

[3] One of the attorneys did make a hearsay objection to the testimony.

16

substance of the threat during closing argument. The threat did not concern the type of conduct for which he was being tried; it did not suggest any predilection to sexually abuse children. Moreover, to the extent that the threat demonstrated the acrimony between Sanchez and Segura's mother, it supported the defense's theory of the case. Consistent with the defense's theory, the jury could have inferred that Sanchez's threat and Segura's allegations about sexual abuse were both parts of the long-running family feud. Finally, it is unlikely that the jury would have convicted Sanchez of sexually assaulting a child based on an angry threat made in the context of the long-running feud. *See Daggett v. State*, 187 S.W.3d 444, 451 (Tex.Crim.App. 2005)(noting that extraneous offense evidence "forces the defendant to defend himself against uncharged crimes as well as the charged offense, and encourages the jury to convict a defendant based upon his bad character, rather than proof of the specific crime charged").

Sanchez also faults his trial counsel for not requesting a continuance on the ground that they were surprised by Segura's testimony that she made the inappropriate drawings as a child. He argues that if a continuance had been granted, counsel would have learned that the prosecution did not have a CPS report. As explained above, counsel already knew that the prosecution did not have a CPS report because it was not included in the State's file. Regardless of whether the prosecution had a copy of a CPS report, Sanchez has not established that no CPS investigation was conducted. Therefore, he has not demonstrated that he would have benefitted from a continuance.

Sanchez's last allegation of ineffectiveness is that counsel failed to object to improper jury argument. He contends that the prosecutor argued facts outside the record and injected her own opinion testimony to corroborate Segura's allegations.

Sanchez refers to the prosecutor's argument that Segura's drawings were "consistent" with sexual abuse. As Powers testified at the new trial hearing, this argument was a reasonable

inference from the evidence. *See Berry v. State*, 233 S.W.3d 847, 859 (Tex.Crim.App. 2007)(stating that reasonable deductions from the evidence may be included in closing arguments).

Sanchez also refers to the prosecutor's argument that Segura did not fabricate her allegations to help her mother in the child custody case. The prosecutor argued that the child custody case "doesn't explain why, in May of 2006, before the granddaughter was born, she told her mother-in-law. Because that little girl they said was three years old. Well, she was born in 2007, and she told her mother-in-law in May of 2006 about what the Defendant had done to her, when there was no custody battle going on." Sanchez argues that there is no evidence as to the date Segura made her outcry to her mother-in-law or as to when Raymond's daughter was born. Sanchez is mistaken. Segura testified that Raymond's daughter was three years old at the time of trial. Since the trial occurred in June 2010, the record supports the prosecutor's assertion that the child was born in 2007. As discussed above, Segura seemed unsure about the exact date of her outcry. But she did testify at one point that she told her mother-in-law about the abuse in April or May of 2006. Therefore, the prosecutor did not argue facts outside the record.

We conclude that the record, even considering the motion for new trial evidence, is not sufficiently developed to establish that Sanchez was denied the effective assistance of counsel. *See Lopez*, 343 S.W.3d at 143-44. Sanchez's second issue is therefore overruled.

## CONCLUSION

Having overruled both issues raised by Sanchez, we affirm the judgment of the trial court.

March 14, 2012

CHRISTOPHER ANTCLIFF, Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.

(Do Not Publish)